(C.D. 3305)

## VOLVO IMPORT, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 21, 1968)

*Sharretts, Paley, Carter & Blauvelt* (*Joseph F. Donohue* and *Michael T. Crimmins* of counsel) for the plaintiff.
*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Arthur H. Steinberg* and *Brian S. Goldstein*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: The four protests in schedule A, annexed hereto and made a part hereof, consolidated for trial, involve certain imported diesel engines manufactured by Penta in Sweden. They were classified by the collector of customs as internal-combustion engines, noncarburetor type, nonhorizontal, under paragraph 372 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and assessed with duty at the rate of 10 per centum or 15 per centum ad valorem, depending on whether the engines weighed under or over 2,500 pounds.

The plaintiff claims that the engines are properly dutiable as internal-combustion motorboat engines, each weighing under 2,500 pounds, and parts thereof, at the rate of 8¾ per centum ad valorem, under paragraph 370 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739.

The protests cover five different types of diesel engines, described on the invoices as the MD–47, MD–67, MD–96, TMD–96, and D–96.

The record is comprised of the testimony of one witness and four exhibits introduced by the plaintiff, and the testimony of one witness and one exhibit for the defendant. The said exhibits, consisting of circulars and a brochure depicting the various engines, are as follows:

Plaintiff's exhibit 1 – Volvo Penta Marine Diesel Engine, MD47B.
Plaintiff's exhibit 2 – Volvo Penta Diesel Engine, MD67C.
Plaintiff's exhibit 3 – Volvo Penta Marine Diesel Engine, MD96B.
Plaintiff's exhibit 4 – Volvo Penta Marine Diesel Engine, TMD96.B1.

Defendant's exhibit A – Describes and pictures the various boats in which the engines at bar are used.

The following are the pertinent parts of the statutes involved:

Classified under:

Paragraph 372 of the Tariff Act of 1930, as modified by T.D. 54108:

Machines, finished or unfinished,
  not specially provided for:

\*       \*       \*       \*       \*       \*       \*

    Internal-combustion engines not of carburetor
  type, \* \* \* if other than horizontal type and
  weighing over 2,500 pounds_____ 15% ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by T.D. 51802:

Machines, finished or unfinished,
  not specially provided for:

\*       \*       \*       \*       \*       \*       \*

    Internal-combustion engines:

\*       \*       \*       \*       \*       \*       \*

    Other, \* \* \* not of horizontal type and
  weighing not over 2,500 pounds each_____ 10% ad val.

Claimed under:

Paragraph 370 of the Tariff Act of 1930, as modified by T.D. 52739:

Internal-combustion motor-boat engines (except non-
  carburetor type weighing over 2,500 pounds each)___ 8¾% ad val.

Paragraph 370, Tariff Act of 1930:

\* \* \* The term "motor boat," when used in this Act, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce \* \* \*.

Mr. Daniel Berott testified for the plaintiff substantially as follows: He has been associated with Volvo, Incorporated, Volvo Lake, New Jersey, for the past 7 years doing marine installation, trouble shooting, repair and maintenance work. His company imports automobiles and marine diesel engines. His experience began in 1925 when he started as an apprentice with Blum & Yoss in Hamburg, Germany, and continued working with diesel engines to date. His experience covered marine, auto, and industrial use.

The witness identified the photograph, including diagram material on the back thereof, in plaintiff's exhibit 1, as a Penta Diesel Marine Engine class MD–47. He did the same with exhibits 2, 3, and 4, representing engines MD–67, MD–96, and TMD–96, the "T" standing for

turbo charger, "MD" for marine diesel, and any letters following a number were, he stated, only modifications to the same basic engine. He marked the diagram on the front and back of exhibit 4 showing the reverse reduction gear, adding that it was not part of the diesel engine, but a separate part. The witness testified that he has installed TMD–96 engines in boats with and without reverse reduction gears; that the approximate weight of the gears varies from 150 to 350 pounds; that plaintiff's exhibits 1, 2, and 3 have such gears; that the gears on plaintiff's exhibit 2 weigh approximately 300 pounds, the gears on plaintiff's exhibit 3 approximately 250 pounds, the gears on plaintiff's exhibit 1 approximately 150 pounds, and the gears on plaintiff's exhibit 4 approximately 300 pounds. He stated that he has installed motors as represented by plaintiff's exhibits 1 through 4 in pleasure craft, and that the TMD–96.B1 was installed by him in a commercial trawler.

On cross-examination, Mr. Berott testified that a marine diesel engine could not be used without reverse reduction gears, that these engines have to have such gears, and that this is true for any type of boat. On direct examination, the witness testified he actually installed the TMD–96 engine both with and without reverse reduction gears. He further testified that he based his knowledge of the weights of the various reverse reduction gears on statements in papers which he had read.

The witness further stated that he installed the TMD–96 in trawlers, which are commercial boats; that he has seen the MD–67 engine in commercial craft; that the MD–47 has no commercial uses, but is used in pleasure boats; that there are commercial applications, in commercial fishing, for engines which utilize heat exchangers for cooling purposes; that commercial craft use engines with a water-cooled manifold.

Mr. Berott further testified that the D–96 engine in dispute could be used as an industrial or marine engine and that, if one seeks to use this engine for marine purposes, it is necessary to add marine parts such as a heat exchanger, manifold, sea water pump, and water cooler. He further testified that the D–96, TMD–96, and the MD–96, with reference to the basic engine, are the same and that the basic engine is nothing more than a diesel engine capable of both industrial or marine use.

The witness stated that the D–96 engine is not a marine engine and could be used for trucks, to drive pumps or a compressor for air conditioning purposes, and, in fact, has various commercial applications. If this motor were modified, it could then be used for marine purposes and could be installed in boats in multiples to give a boat more horsepower. Indeed, Mr. Berott stated that he had installed three

engines of the type represented by plaintiff's exhibit 2 in a pleasure boat used for fishing.

The witness testified that defendant's exhibit A is a catalog distributed by his company which depicts and explains the engines at issue. He testified that he was not familiar with defendant's exhibit B for identification and did not know whether it was distributed by his company.

Mr. Berott further testified that the MD-47 and MD-96, because of their limited horsepower, were not suited to commercial use, but that he had seen the MD-67, MD-96, and TMD-96 used commercially.

Mr. Adolph Arthur Liefke testified for the defendant substantially as follows: He is manager of sales and engineering of Rudox Engine and Equipment Company, has been with the firm for 9 years, and handles the sales of diesel engines for marine applications, generator sets, and general industrial use. Their largest markets are in New York, New Jersey, Connecticut, and Long Island. His duties include visiting and inspecting various marine craft into which his company's units are to be installed; he makes any necessary recommendations for the proper application of the engine in regard to the size of the propellers and the r.p.m. of the reduction gears in relation thereto. He stated that after the engines are installed, he visits the job site to assist in starting the engines, or advise the best procedure in their installation, furnishing drawings and engineering advice.

Before joining Rudox company, Mr. Liefke was associated with Allis-Chalmers Manufacturing Company, where he held the position of sales engineer; that before that, he was associated with the Liefke Diesel and Compressor Company; that he has had experience with marine diesel engines back to 1937. He testified that he was familiar with the engines depicted by plaintiff's exhibits 1, 2, 3, and 4; he has seen diesel engines similar to those at bar in use and was familiar with their operation. He stated that the engines at bar were capable of heavy duty operations such as required by work boats and fishing boats, and that they are capable of use to provide the motive force for commercial as well as pleasure craft. He stated that "light duty operation" generally in the trade was used where the engine is to operate under light duty conditions, such as in pleasure craft and intermittent duty; that "heavy duty operation" means the engine is capable of running for long, extended periods, continuously, without overhauls. He stated that the engines depicted by plaintiff's exhibits 1 through 4 were very similar in construction, in specifications, physical size, cubic inch piston displacement, and horsepower to the Allis-Chalmers engines which his present firm sells. He stated that he has seen such engines used in lobster boats, various types of fishing craft, and party boats.

On cross-examination, the witness testified that he had not seen the actual engines at bar, and that they could be used in pleasure craft; that he had no engineering degree although he has had approximately 30 years of actual experience in the field, and obtained some of his knowledge of the engines actually in issue from reading some literature or brochures.

In the course of trial, testimony by plaintiff's witness disclosed that engine D–96 on entry N–87 covered by protest 61/1947 was an air-cooled industrial engine and not a marine engine. Counsel for defendant thereupon moved to dismiss the protest as to this item. Plaintiff's counsel admitted on the record that said item was not intended to be included in its affirmative case. Decision on the motion was reserved by the court. In view of the foregoing, and since other entries were included under protest 61/1947, the defendant's motion to dismiss is hereby granted as to engine D–96 on entry N–87, protest 61/1947.

This ruling leaves the remaining engines in controversy TMD–96, MD–96, MD–47, and the MD–67.

Counsel for the plaintiff in their brief argue that these diesel engines are parts of motorboats as described in paragraph 370 of the Tariff Act of 1930, specifically dedicated to use as parts of pleasure craft, not intended or suitable for use in boats engaged in trade or commerce. Among the dedication features which they cite are:

1. A heat exchanger installed in the front of the engine;
2. A water cooled manifold;
3. A sea water pump circulating sea water around the engine for heat exchanger purposes; and
4. A fresh water supply for the engine not found in engines adapted for stationary or commercial uses.

Our interpretation is that while these are features attributable to the marine engines, they do not spell out that they are chiefly used in motorboats or pleasure craft as contemplated in paragraph 370 since it is apparent from the record and from our common knowledge that any marine engine used in trade and commerce very likely would be similarly equipped. Merchandise such as parts which are subject to classification by ultimate use within a tariff designation must be dedicated to such use. *National Carloading Corp.* v. *United States*, 44 CCPA 77, C.A.D. 640. As indicated, *supra*, we are of the opinion that the four factors quoted, *supra*, establish at best dedication of the engines to marine use but fall short of establishing dedication to the ultimate use required in paragraph 370, *supra*.

Since the provision claimed involves internal-combustion motorboat engines (except noncarburetor type weighing over 2,500 pounds each),

the first consideration of the court is to determine if the subject engines are in fact internal-combustion engines of the noncarburetor type. They were so classified and there appears to be no question that said engines are in fact within that category. The question as to the weight should next be resolved.

The plaintiff's contention that the weight of the reverse and reduction gear is not part of the weight of the engine is not significant here since it is clear from the commercial invoices that the MD–96 engine on entry N–2646 in protest 60/26146 and the TMD–96 engine on entry N–1294 in protest 60/26146 were exported to the United States *without* reverse and reduction gears and were assessed, in that condition, at the rate of 15 percent ad valorem under paragraph 372, *supra*. The collector necessarily found that these engines, without reverse and reduction gears, weighed in excess of 2,500 pounds each. The specifications listed on defendant's exhibit A state that the TMD–96 engine weighs approximately 2,760 pounds and that the MD–96 engine weighs approximately 2,650 pounds. Paragraph 370, *supra*, specifically excludes such engines by virture of their weight.

We note that the plaintiff's witness testified concerning the weights of the various reverse and reduction gears, using in each instance the term "approximately". This, defendant's counsel contends, was not based upon personal knowledge but on certain shipping papers which the witness read but which were not placed in evidence. Counsel's point is well taken and is substantiated by the record.

The balance of the engines, having been classified as under 2,500 pounds and there appears to be no dispute that said engines are in fact under said weight, fall within the category provided for in paragraph 370, *supra*, if they are in fact motorboat engines.

The defendant argues that paragraph 370, *supra*, requires that, in order for a motorboat to be classified as such, it must be (a) owned by a resident of the United States or brought into the United States for sale or charter to such resident, and (b) be a boat not "used or intended to be used in trade or commerce". The burden of proof is upon the plaintiff. As is well stated in *The Newman Company* v. *United States*, 57 Cust. Ct. 117, C.D. 2739 :*

To establish a claimed classification, we require that every fact necessary for that classification be proved by the importer, even negatives. [Citing cases.] However, we do not require oral testimony when the article itself as a "potent witness" establishes the fact with but a negligible possibility of error. *John S. Connor, Inc.* v. *United States*, 54 Cust. Ct. 213, C.D. 2536. * * *

---

*Refers also to *United States* v. *William Herman Wepner,* 32 CCPA 30, C.A.D. 282, in which the background and purpose of paragraph 370 are given in detail.

In our opinion, the instant record does not establish satisfactorily either the positive or the negative elements of statutory proof required under paragraph 370. Defendant's exhibit "A" in evidence substantiates the classification in that it illustrates the various types of boats in which Penta marine diesel engines were used, and, with modifications, still are used in exhibits 1, 2, 3, and 4. The first illustration at top left shows "Tug MD–47". Seven other boats are illustrated as powered by the Penta engine. Their appearance to our visual examination does not suggest a dedication to pleasure craft. As stated in the *Newman Company* case, *supra:*

\* \* \* No one would call a tug boat a yacht \* \* \*.

In addition, plaintiff's exhibits 1 and 2 covering the MD–47B and MD–67C, and defendant's exhibit A covering the MD–47, MD–67, MD–96, and TMD–96 engines indicate commercial marine use. Therefore, plaintiff's argument that the imported Penta engines are dedicated to use as parts of pleasure craft is not persuasive as a valid claim. Plaintiff's own witness testified that the engines at bar, with the special features for marine use, could be employed on commercial craft as well as on pleasure boats. Plaintiff's further argument that the engines at bar were limited to noncommercial uses because of limited horsepower is not convincing, since we note their employment in commercial craft such as that depicted in defendant's "Exhibit A" with these words:

The Penta MD–67, in common with the MD–47, has an extensive field of use. It is giving faithful service in motor yachts and fishing boats, tugs and freighters, pilot cutters and customs cruisers.

Since the MD–47 is the smallest of the marine engines here in controversy and is capable of performing the heavy duties outlined in the brochure, we are unable to accept plaintiff's argument that the engines are limited to pleasure or noncommercial craft. As stated in the *Newman* case, *supra*, we are aware that a motorboat may be classified under paragraph 370 even though not a yacht or pleasure boat, but it may not be there classified if it is used or intended to be used in trade or commerce.

After carefully weighing the record, it is our opinion that the plaintiff has not overcome the presumption of correctness attaching to the collector's classification.

Based upon the foregoing, we find the claims of the plaintiff herein to be without merit. The claims in the protests, therefore, are overruled except insofar as the claim in protest 61/1947 relates to engine D–96 covered by entry N–87, which claim is dismissed. Judgment will be entered accordingly.